**MEYERS FRIED-GRODIN, LLP**
Jonathan Meyers, Esq., Attorney No. 019061999
1259 Route 46 East
Building 4E, Suite 11
Parsippany, NJ 07054
Phone (973) 453-4847
Fax (973) 975-4922
E-mail: Jmeyers@MfgLegal.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARMEN MABILLE, MAUREEN BEECH, RITA BLASER, BARBARA MASTEN, individually and on behalf of all others similarly situated, | Case No.  2:19-cv-16849 |
| Plaintiffs, | **COMPLAINT AND JURY DEMAND** |
| vs. | |
| BERGEN COUNTY HEALTH CARE CENTER, BERGEN COUNTY, VIOLETTA ARCILLA individually, HARVEY SILBERSTEIN, individually, and JOHN DOES 1-10, and ABC ORGANZATIONS 1-10, fictitious names for persons or entities whose present roles and identities are unknown, | |
| Defendants. | |

Plaintiffs, Carmen Mabille, Rita Blaser, Maureen Beech, and Barbara Masten, on behalf of themselves and all other similarly situated past and present employees, by and through their attorneys, Meyers Fried-Grodin, LLP, as and for a Complaint, states as follows:

### STATEMENT OF THE CASE

1.  This is an action, brought by nurses, currently and formerly employed by Bergen County and the Bergen County Health Care Center ("BCHCC"), who worked at the facility between

January 1, 2015 and the present and continuing up until the date of the conclusion of this lawsuit (the "Class Period"), who experienced systemic racial discrimination in the form of: unwarranted discipline, reduced hours, lost opportunities to work at an overtime rate of pay, and actual or constructive termination, due to Defendant Violetta Arcilla becoming BCHCC's Director of Nursing ("DON") in 2015 and using her position to discriminate against non-Filipino nurses in favor of nurses of a Filipino background.

## THE PARTIES

**A.  Plaintiff Carmen Mabille**

2.  Plaintiff Carmen Mabille is a nurse.  She lives in New Jersey in Bergen County.

3.  Ms. Mabille has worked as a nurse at BCHCC's facility in Rockleigh, New Jersey (in Bergen County) since in or about 2005 and is still a current employee.

4.  Ms. Mabille has been (and continues to) experience adverse employment actions aimed at pushing her out of her job.

**B.  Plaintiff Maureen Beech**

5.  Plaintiff Maureen Beech is a nurse.  She lives in New Jersey in Bergen County.

6.  Ms. Beech worked as a nurse at BCHCC's facility in Rockleigh, New Jersey since in or about August 2006 until on or about January 1, 2019 and is still a current employee.

7.  Ms. Beech has been (and continues to) experience adverse employment actions aimed at pushing her out of her job.

**C.  Plaintiff Rita Blaser**

8.  Plaintiff Rita Blaser is a nurse.  She lives in New Jersey in Bergen County.

9.  Ms. Blaser worked as a nurse at BCHCC's facility in Rockleigh, New Jersey since in or about July 2001 until on or about January 1, 2019 when she was involuntarily pushed out of her job.

**D.  Plaintiff Barbara Masten**

10. Plaintiff Barbara Masten is a nurse.  She lives in New Jersey in Pennsylvania.

11. Ms. Masten worked as a nurse at BCHCC's facility in Rockleigh, New Jersey since in or about October 2003 until on or about October 31, 2018 when she was involuntarily pushed out of her job.

**E.  Defendant Bergen County Health Care Center**

12. Defendant BCHCC is a nursing home located in Rockleigh, New Jersey (in Bergen County) that is owned and operated by Bergen County.

**F.  Defendant Bergen County**

13. Bergen County is a government entity, which is a county in New Jersey.

**G.  Defendant Violetta Arcilla**

14. Defendant Violetta Arcilla is currently the DON at BCHCC.  She has held that position since in or about 2015.

15. Defendant Violetta Arcilla, at all relevant times, was the direct supervisor of Plaintiffs (and the other nurses who are class action plaintiffs in this case) and had the authority to fire, hire, discipline, set schedules, provide or restrict working hours, and provide or restrict overtime opportunities.

16. Defendant Violetta Arcilla currently still holds the position of DON at BCHCC.

H.  **Defendant Harvey Silberstein**

17. Defendant Harvey Silberstein, at all relevant times, has held the position of Administrator at BCHCC.

18. Defendant Harvey Silberstein, at all relevant times, had authority over Plaintiffs (and the other nurses who are class action plaintiffs in this case) and had the authority to fire, hire, discipline, set schedules, provide or restrict working hours, and provide or restrict overtime opportunities.  Mr. Silberstein also had the power to respond to internal complaints about unlawful discrimination, but did not respond properly, thus leading to retaliation and additional discrimination.

**JURISDICTION AND VENUE**

19. Jurisdiction is based on 28 U.S.C. § 1331, insofar as this action involves statutes of the United States, and specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq*. ("Title VII").

20. Additionally, Plaintiffs rely upon 28 U.S.C. § 1367 to invoke supplemental jurisdiction with respect to state law claims that form other bases for recovery upon the same factual nexus.

21. Venue is based on 28 U.S.C. § 1391(b)(1) insofar as at least one of the Defendants resides within this Judicial District, and (b)(2) insofar as a substantial part of the events giving rise to the within causes of action occurred in this Judicial District.

22. With respect to Plaintiffs' federal discrimination and retaliation claims, in May 2019, all four Plaintiffs filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") dated May 16, 2019.

23. The EEOC issued four Right to Sue Letters to each of the Plaintiffs – each dated July 12, 2019.

## **FACTS COMMON TO ALL COUNTS**

24. Plaintiffs re-alleges and incorporates the allegations set forth in paragraphs above.

**A. Carmen Mabille's Experiences of Discrimination, Being Set Up for Termination and Loss of Overtime Opportunities**

25. Carmen Mabille has been working as a Nurse for BCHCC for approximately fourteen (14) years. She started work there in 2005 and remains currently employed. Moreover, she had a good work record and enjoyed a sterling professional reputation, up until in or about 2015, when Violetta Arcilla became the DON.

26. In sum, by every objective measure, Nurse Mabille has have been a long-proven employee, whom BCHCC would reasonably be expected to try to retain -- barring hidden, unlawful motives.

27. When DON Arcilla became the Director of Nursing at BCHCC (in or about 2015), she has, as part of a pattern and practice, forced out (or set up to force out) nurses of non-Filipino ethnicity to allow her to replace them with nurses – who like DON Arcilla herself – are of Filipino ancestry. (As of May, 2019 – there have been at least 10 Filipino nurses hired by Arcilla to replace non- Filipino nurses). Unlike DON Arcilla – and those whom she favors – Nurse Mabille is Hispanic.

28. DON Arcilla's bias has infected the County's decisions with respect to the terms and conditions of the nurses working at the Defendants' actions constitute violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 21 *et. seq.*), including Nurse Mabille.

29. Since 2015, DON Arcilla has engaged in a variety of actions aimed at making work difficult for Nurse Mabille and making it so Mabille will want to quit.

30. DON Arcilla has done this to many of the non-Filipino nurses.  Between making life so difficult for non-Filipino nurses – or creating pretexts for unwarranted discipline and then firing them – very few non-Filipino nurses are left.  The few who remain fear for their jobs.

31. This concerted effort at pushing Nurse Mabille out of her job is part of a discriminatory scheme that has resulted in adverse employment actions against Mabille (and her non-Filipino colleagues) since DON Arcilla began making decisions about the terms and conditions of these nurses on the County's behalf.

32. Here are some examples of things DON Arcilla has done to harm Nurse Mabille, try to get Mabille to leave her job, and to set Mabille up for discipline and likely eventual termination:

i.    DON Arcilla has disciplined Nurse Mabille (*i.e.*, docking pay) for calling out after a scheduled day off.  This caused Mabille's pay to be tied up for several weeks and Arcilla overly-scrutinized Mabille and made Mabille prove her innocence (and Mabille was later exonerated after it was revealed that Arcilla's claims were false and unfounded).  Other Filipino nurses have engaged in the same kind of thing (or much more) but have not been disciplined or scrutinized by Arcilla.  Instead, there has been a pattern of indulgence on these kinds of issues by DON Arcilla towards Filipino nurses.

ii.   DON Arcilla has directed that overtime opportunities be diverted away from Non-Filipino nurses, to the Filipino nurses, as discussed in paragraph 34, below.

iii.  Filipino nurses were given preference.  There was an incident wrong medication was delivered.  Nurse Mabille was not notified.  However, because the infraction was committed by a Filipino nurse, the incident was swept under the rug.  If Mabille (or a non-Filipino nurse) had done this, DON Arcilla would have surely imposed discipline.

iv.   When Filipino nurses come in late or leave early, they are not disciplined nor is pay docked.  When Filipino nurses come in late or leave early, they are not disciplined nor is their pay docked.

v.    DON Arcilla subjected Nurse Mabille to more scrutiny than Filipino nurses – looking for a reason to push Nurse Mabille (and other non-Filipino nurses out).

vi.   When favorable shifts become available, they not posted generally.  Instead, DON Arcilla offers them directly to Filipino nurses.

33.     DON Arcilla and the County are on a course towards forcing Nurse Mabille out of her job.  At this point, Nurse Mabille reasonably expects to be fired and expects to be subjected to so much in the way of pretextual fabrications about her performance that she (or any reasonable person in her position) would be placed in a position where there is no realistic option other than to quit.  Nurse Mabille has seen DON Arcilla enact this practice on many non-Filipino nurses and it is clear that she is also doing it to Nurse Mabille.  Consequently, in light of this quit or be fired soon scenario (and in addition to DON Arcilla's making the conditions of employment so bad for Nurse Mabille that no reasonable person could be expected to endure it), Nurse Mabille plans to file for her retirement soon.  After that, Nurse Mabille will be without a job.

34. One concrete form of disparate treatment that Nurse Mabille (and other non-Filipino nurses) have suffered at the BCHCC is a lesser rate of pay than Filipino nurses.  More specifically, since DON Arcilla came to work at the BCHCC, Filipino nurses have been given preference to work overtime hours (at a substantially higher rate of pay than straight time).  As a result, Nurse Mabille and other non-Filipino nurses were denied almost all overtime opportunities.  To Nurse Mabille's knowledge, the only overtime opportunities available to her and other non-Filipino nurses were during situations in which Filipino nurses did not want to work overtime hours.  Then, only what was left over was available to the non-Filipino nurses – which was substantially less valuable and infrequent.  Additionally, DON Arcilla gives Filipino nurses the opportunity to work the most coveted better hours.

35. The discrimination and retaliation Nurse Mabille has endured have caused her severe emotional distress.

36. Additionally, Harvey Silberstein, who is the Administrator at the BCHCC, knew about the pattern and practice of discrimination against non- Filipino nurses and did nothing to stop it. Instead, he allowed it to continue and emboldened DON Arcilla.

**B. Maureen Beech's Experiences of Discrimination, Being Set Up for Termination and Loss of Overtime Opportunities**

37. Maureen Beech has been working as a Nurse for BCHCC for approximately thirteen (13) years. Nurse Beech started to work there on or about August 17, 2006 and she remains currently employed. Furthermore, Nurse Beech had an excellent work record and enjoyed a great professional reputation, up until in or about 2015, when Violetta Arcilla became the DON.

38. In sum, by every objective measure, Nurse Beech was a long-proven employee, whom BCHCC would reasonably be expected to try to retain -- barring hidden, unlawful motives.

39. When DON Arcilla became the Director of Nursing at BCHCC (in or about 2015), she has, as part of a pattern and practice, forced out (or set up to force out) nurses of non-Filipino ethnicity to allow her to replace them with nurses – who like DON Arcilla herself – are of Filipino ancestry. Unlike DON Arcilla – and those whom she favors – Nurse Beech is African American.

40. DON Arcilla's bias has overtaken the County's decisions with respect to the terms and conditions of employment for the nurses working at the BCHCC, including Nurse Beech. Since 2015, DON Arcilla has engaged in actions aimed at making work difficult for Beech and making it so Beech will want to quit. Arcilla has done this to many of the non-Filipino nurses. Between making life so difficult for non-Filipino nurses – or creating pretexts for unwarranted discipline and then firing them – very few non-Filipino nurses are left. The few who remain fear for their jobs, including Nurse Beech. This coordinated effort at pushing Nurse Beech out of her job is part of a discriminatory scheme that has resulted in adverse employment actions against Nurse

Beech (and her non-Filipino colleagues) since DON Arcilla began making decisions about the terms and conditions of employment of these nurses on the County's behalf.

41. Here are some examples of things DON Arcilla has done to harm Nurse Beech, try to get Nurse Beech to leave her job, and to set her up for discipline and likely eventual termination:

i.   Starting in or about Winter 2019, Nurse Beech was not allowed to work on regular units. Instead, Nurse Beech has only been able to work as a floater between different units, which is less desirable to her and is considered less desirable by most or all nurses. Based on Nurse Beech's seniority, she should not have to be floater at this point in her career at the County.

ii.  As described in paragraph 42 below, overtime rate of pay hours are not regularly available to Nurse Beech or other non-Filipino nurses. Instead, Filipino nurses are given overwhelming preference.

iii. Nurse Beech has been overly-scrutinized and written up for medication data entry issues. Filipino nurses are not subjected to this kind of scrutiny or discipline. It appears that this extra scrutiny is being applied to Nurse Beech so as to create a justification for DON Arcilla to cause Nurse Beech's employment to end so that she can replace Nurse Beech with a Filipino nurse.

42. One concrete form of disparate treatment that Nurse Beech (and other non-Filipino nurses) have suffered at the BCHCC is a lesser rate of pay than Filipino nurses. More specifically, since DON Arcilla came to work at the County, Filipino nurses have been given preference to work overtime hours (at a substantially higher rate of pay than straight time). As a result, Beech and other non-Filipino nurses were denied almost all overtime opportunities. To Nurse Beech's knowledge, the only overtime opportunities available to Beech and other non-Filipino nurses were during situations in which Filipino nurses did not want to work overtime hours, such as when they went on vacation. Then, only what was left over was available to the non-Filipino nurses – which was substantially less valuable and infrequent. Additionally, DON Arcilla gives Filipino nurses the opportunity to work the most sought after and better hours.

43. DON Arcilla and the County may very well try to force Nurse Beech out of her job, like they have with respect to other non-Filipino nurses. At this point, Nurse Beech reasonably

expects she may be fired and she expects to be subjected to so much in the way of pretextual fabrications about her performance that she -- or any reasonable person in Nurse Beech's position -- would be placed in a position where there is no realistic option other than to quit. Nurse Beech has seen DON Arcilla enact this practice on many non-Filipino nurses and it is clear that she is also doing it to Nurse Beech.

44. The discrimination and retaliation Nurse Beech has endured have caused her severe emotional distress.

45. Additionally, it is Nurse Beech's understanding that Harvey Silberstein, who is the Administrator at the BCHCC, knew about the pattern and practice of discrimination against non-Filipino nurses and did nothing to stop it. Instead, he allowed it to continue and emboldened DON Arcilla.

**C. Rita Blaser's Experiences of Discrimination, Retaliation, Being Forced Out of Her Job and Loss of Overtime Opportunities**

46. Nurse Rita Blaser has worked as a Nurse for BCHCC for approximately seventeen (17) years. Nurse Blaser started work there on or about July 23, 2001. Moreover, Nurse Blaser had a good work record and enjoyed a sterling professional reputation, up until recently (in or about 2015), when Violetta Arcilla became the DON.

47. In sum, by every objective measure, Nurse Blaser was a long-proven employee, whom BCHCC would reasonably be expected to try to retain -- barring hidden, unlawful motives.

48. It is no secret at the BCHCC that since DON Arcilla has become the Director of Nursing (in or about 2015), she has systematically pushed out (or set up to push out) nurses of non-Filipino ethnicity to allow her to replace them with nurses – who like DON Arcilla herself – are of Filipino ancestry.

49. DON Arcilla's bias has infected the County's decisions with respect to the terms and conditions of the nurses working at the BCHCC, including Nurse Blaser.  The current effort at pushing Nurse Blaser out of her job is the latest part of this discriminatory scheme that has resulted in adverse employment actions against Nurse Blaser (and her non-Filipino colleagues) since DON Arcilla began making decisions about the terms and conditions of these nurses on the County's behalf.  Unlike DON Arcilla and the nurses she shows preference to, Nurse Blaser is white/Caucasian.

50. Notably on August 9, 2016 Nurse Blaser lodged a written complaint with Michelle Popkins, Assistant Director of Personnel, in which Nurse Blaser decried a "hostile work environment" created by DON Arcilla.  In that statement, Nurse Blaser cited, among other things, disparate treatment, defamatory statements, and a variety of other examples of harassing conduct.  After making that internal complaint, DON Arcilla retaliated against Nurse Blaser.

51. More recently, as DON Arcilla's efforts to push Nurse Blaser out of BCHCC, an attorney, Richard Wenner, sent a letter, dated October 24, 2018 to the BCHCC's Administrator, Harvey Silberstein.  In that letter, the hostile work environment and discriminatory preferential treatment that DON Arcilla exhibited were again raised.  After the County received that letter, Nurse Blaser was subjected to additional disparate treatment and retaliation by being served with a Preliminary Notice of Disciplinary Action dated January 1, 2019 (the "Notice").

52. The Notice falsely insinuates that Nurse Blaser did not properly treat a patient.[1]  The subject facts underlying the Notice do not constitute any *bona fide* grounds for discipline.  Instead, they have been used and embellished so as to create a pretext for discrimination and retaliation.

---

[1] In the interest of privacy, Plaintiffs are not stating patient names in this document.

53. In reality, on October 18, 2018, Nurse Blaser, in her treatment of that patient, acted the way any reasonable nurse would under those circumstances. The County's attempt to generate a pretext is evident by the lengths to which it went in describing the underlying facts in such as way as to give a casual reader of the document the false impression that Nurse Blaser committed medical malpractice which killed a patient.

54. DON Arcilla's smear campaign may have serious repercussions. Among other things, Nurse Blaser has been suspended without pay since on or about January 7, 2019. Nurse Blaser has not received any pay since that date. Additionally, to Nurse Blaser's knowledge, the County has not yet held the hearing for her to contest the assertions made against her in the Notice.

55. As a practical matter, Nurse Blaser has been separated from her employment since early 2019, given that she: (i) is no longer being paid, (ii) cannot return to work, (iii) has no realistic chance of ever being allowed to return to work.

56. Nurse Blaser has been completely frozen out of her job and have, in all practical ways, been fired. Having been involuntarily forced out of her job, Nurse Blaser has not been able to find comparable work elsewhere, and she have been suffering financially since the County stopped paying her and stopped allowing Blaser to work there. Thus, the first form of disparate treatment Nurse Blaser has suffered is the loss of her employment. Other non-Filipino nurses have also been similarly pushed out of their jobs.

57. Another form of disparate treatment that Nurse Blaser (and other non-Filipino nurses) have suffered at the BCHCC is a lesser rate of pay than Filipino nurses. More specifically, since DON Arcilla came to work at the County, Filipino nurses were given preference to work overtime hours (at a substantially higher rate of pay than straight time). As a result, Nurse Blaser and other non-Filipino nurses were denied almost all overtime opportunities. To Nurse Blaser's

knowledge, the only overtime opportunities available to Nurse Blaser and other non-Filipino nurses were during situations in which Filipino nurses did not want to work overtime hours. Then, only what was left over was available to the non-Filipino nurses.

58. Additionally, DON Arcilla gives Filipino nurses the opportunity to work the most coveted better hours.

59. The discrimination and retaliation Nurse Blaser has endured have caused her severe emotional distress.

60. Additionally, Harvey Silberstein, who is the Administrator at the BCHCC, knew about the pattern and practice of discrimination against non- Filipino nurses and did nothing to stop it. Instead, he allowed it to continue and emboldened DON Arcilla.

### D. Barbara Masten's Experiences of Discrimination, Retaliation, Being Forced Out of Her Job and Loss of Overtime Opportunities

61. Barbara Masten have been working as a Nurse for BCHCC for approximately fifteen (15) years.  Nurse Masten worked there between in or about October 2003 and on or about October 31, 2018.  Moreover, Masten had a good work record and enjoyed a sterling professional reputation, up until in or about 2015, when Violetta Arcilla became the Director of Nursing ("DON").

62. In sum, by every objective measure, Nurse Masten was a long-proven employee, whom BCHCC would reasonably be expected to try to retain -- barring hidden, unlawful motives.

63. When DON Arcilla became the Director of Nursing at BCHCC (in or about 2015), she has, as part of a pattern and practice, forced out (or set up to force out) nurses of non-Filipino ethnicity to allow her to replace them with nurses – who like DON Arcilla herself – are of Filipino ancestry.  Unlike DON Arcilla – and those whom she favors – Nurse Masten is white/Caucasian.

64. DON Arcilla's bias has infused the County's decisions with respect to the terms and conditions of the nurses working at the BCHCC, including Nurse Masten.  Since 2015, DON Arcilla has engaged in a variety of actions aimed at making work difficult for Nurse Masten and making it so she will want to quit.  DON Arcilla has done this to many of the non-Filipino nurses.  Between making life so difficult for non-Filipino nurses – or creating pretexts for unwarranted discipline and then firing them – very few non-Filipino nurses are left.  The few who remain fear they will lose their jobs if they complain.  This concerted effort at pushing Nurse Masten out of her job is part of this discriminatory scheme that has resulted in adverse employment actions against Nurse Masten (and her non-Filipino colleagues) since DON Arcilla began making decisions about the terms and conditions of these nurses on the County's behalf.

65. Here are some examples of things DON Arcilla has done to harm Nurse Masten, try to get Masten to leave her job, and to set Masten up for discipline and likely eventual termination:

i.  Nurse Masten (and other nurses) were disciplined for tardiness – sometimes for mild infractions (or really no bona fide infraction at all).  On the other hand, Filipino nurses who were late – even significantly late – were not disciplined.  Additionally, Filipino nurses could call out without disciplinary repercussions.  They were given preferential treatment.

ii.   In or about Summer 2018, Nurse Masten complained to Administrator Harvey Silberstein, but he did nothing in response.  It was clear that anything that was told to him was shared with DON Arcilla.

66. DON Arcilla and the County forced Nurse Masten out of her job.  At the point at which Nurse Masten separated from her employment, Masten reasonably expected to be fired and she expected to be subjected to so much more in the way of pretextual fabrications about her performance that she (or any reasonable person in her position) would feel that there was no realistic option other than to quit.  Although Nurse Masten knew that her pension would take a hit by leaving her employment early, she was compelled to leave in October 2018.

- 14 -

67. Nurse Masten has seen DON Arcilla enact this practice on many non-Filipino nurses and it is clear that she also did it to Masten.

68. Another form of disparate treatment that Nurse Masten (and other non-Filipino nurses) have suffered at the BCHCC is a lesser rate of pay than Filipino nurses.  More specifically, since DON Arcilla came to work at the County, Filipino nurses have been given preference to work overtime hours (at a substantially higher rate of pay than straight time).  As a result, Nurse Masten and other non-Filipino nurses were denied almost all overtime opportunities.

69. As far as Nurse Masten knows, the only overtime opportunities available to her and other non-Filipino nurses were during situations in which Filipino nurses did not want to work overtime hours.  Then, only what was left over was available to the non-Filipino nurses – which was substantially less valuable and infrequent.  Additionally, DON Arcilla gave Filipino nurses the opportunity to work the most coveted better hours.

70. The discrimination and retaliation Nurse Masten has endured have caused her severe emotional distress.

71. Additionally, Harvey Silberstein, who is the Administrator at the BCHCC, knew about the pattern and practice of discrimination against non- Filipino nurses and did nothing to stop it. Instead, he allowed it to continue and emboldened DON Arcilla.

## CLASS ACTION ALLEGATIONS

72. Plaintiffs re-allege and incorporate the allegations set forth in the paragraphs above.

73. Plaintiffs bring their claims, pursuant to Title VII and the New Jersey Law Against Discrimination ("NJLAD"), on behalf of themselves and those similarly situated past and present employees who worked as nurses for Defendants, during the Class Period, as a class action

pursuant to F.R.C.P. 23(a); 23(b)(2); and 23(b)(3), seeking liability-phase injunctive and declaratory relief and monetary damages for make-whole relief and other relief.

74. The Defendants named herein are liable under Title VII and the NJLAD for discriminating against current and/or former non-Filipino nurses on the basis of their race and for retaliating against those nurses who engaged in legally-protected activity by complaining.

75. In this class action, Plaintiffs seek to include two classes and subclasses. The first class is that of nurses who worked for defendants, during the Class Period, and who are still currently employed and suffered the discrimination alleged herein (the "Currently Employed Class"). The second class is that of nurses who worked for Defendants, during the Class Period, who are no longer employed and suffered the discrimination alleged herein (the "Formerly Employed Class"). The first subclass is that of nurses who worked for defendants, during the Class Period, and suffered the discrimination alleged herein and retaliation for engaging in legally protected activity within the meaning of Title VII and/or the NJLAD. The second subclass is that of nurses who worked for defendants, during the Class Period, but do not assert claims for retaliation.

76. Upon information and belief, there are approximately twenty (20) other similarly-situated current and/or former non-Filipino nurses employed by Defendants who were discriminated against and/or retaliated against.

77. The aforementioned similarly-situated employees are known to the Defendants, are otherwise identifiable, and can, upon information and belief, be located through Defendants' records.

78. All members of the Class allege money damages.

79. All members of the Class allege temporary and permanent injunctive relief, and declaratory relief because the parties opposing the Class have acted on grounds generally applicable to the Class, thereby making appropriate injunctive relief to the Class as a whole.

80. Excluded from the aforementioned Class are the Defendants, their legal representative, heirs, officers, assigns, and successors.

81.   <u>Numerosity:</u> The Class is so numerous that joinder of all members is impracticable. The precise number of members is not known at this time because such knowledge is exclusively available to the Defendants.

82.   <u>Existence of Common Questions of Fact:</u> The common nucleus of operative facts to be determined for the Class as a whole center upon: (i) Defendants' efforts to push non-Filipino nurses out of their employment at BCHCC; and (ii) the Defendants' denial of overtime rate of pay work opportunities to non-Filipino nurses.

83.   <u>Existence of Common Questions of Law:</u> There are common questions of law and fact that exist as to the Class that predominate over any questions affecting class members individually which include, but are not limited to:

(i)     Whether the Defendants engaged in a pattern and practice of trying to push Non-Filipino nurses out of their employment at BCHCC in favor or Filipino nurses;

(ii)    Whether the Defendants engaged in a pattern and practice of denying overtime rate of pay opportunities to non-Filipino nurses in favor or Filipino nurses;

(iii)   Whether the Defendants' conduct violated Title VII;

(iv)    Whether the Defendants' conduct violated the NJLAD;

(v)     Whether the Defendants' conduct violated the New Jersey Equal Pay Act ("NJEPA"); and

(vi)    Whether, in accordance with the requirements of applicable statutory law and organizational policy, the Defendants kept adequate records with respect to: (i)

hiring and firing decision making decisions; and (ii) wages they paid to their employees.

84.    <u>Typicality:</u> The typicality requirement is met insofar as the claims of the named Plaintiffs are typical of the Class they seek to represent. The statutory and regulatory protections afforded by Title VII, the NJLAD, and the NJEPA asserted herein are applicable to and protective of the named Plaintiffs and Class members.  The named Plaintiffs, as well as the class members, have all been injured as a result of Defendants' policy and practice of violating such provisions.

85.    <u>Adequacy:</u> Plaintiffs will fairly and adequately represent and protect the interests of all Class members.  The named Plaintiffs' claims are typical of the claims belonging to all Class members, and there is no conflict between Plaintiffs and the Class members.  Additionally, the named Plaintiffs have retained competent counsel who is experienced in complex litigation and class action litigation.

86.    <u>Superiority:</u> With notions of fairness and efficiency in mind, a class action is the superior method of adjudicating this litigation.  The named Plaintiffs and Class members are and were victims of the same policies and practices, instituted by the same Defendants, which violated the same provisions of Title VII, the NJLAD and the NJEPA.  Upon information and belief, many of the individual Class members do not have the financial resources to adequately prosecute this claim, and absent a class action, they would not have any redress. There are no unusual difficulties that will be encountered in the management of this class action as the proofs as to liability are common to all class members.  Furthermore, class litigation will ensure a consistent verdict and otherwise obviate the need for duplicative litigation.

87. Accordingly, this action can be maintained as a Class Action.

## COUNT ONE
### (Title VII – Disparate Treatment Based on Race)

88. Plaintiffs re-alleges and incorporate the allegations set forth in the paragraphs above.

89. Defendants caused Plaintiffs, and the entire class of non-Filipino Nurses employed by BCHCC during the Class Period to experience adverse employment actions, including lower compensation, constructive discharge and/or being set up for termination or constructive discharge, due to their race (*i.e.*, being a member of a race other than the preferred race of Filipino).

90. Defendants' actions constitute violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et. seq.*)

91. As a result of Defendants' unlawful actions, Plaintiffs in the Currently Employed Class have suffered a loss of wages, benefits, advancements in seniority, and other emoluments of employment and emotional distress; and Plaintiffs in the Formerly Employed Class have suffered a loss of their employment, loss of wages, benefits, advancements in seniority, and other emoluments of employment and emotional distress.

92. Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiffs' rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages.

93. At all relevant times, the individual Defendants and/or other wrongdoers, acted as agents of Bergen County and BCHCC, and Bergen County and BCHCC are vicariously liable for their actions.

## COUNT TWO
### (NJLAD – Disparate Treatment Based on Race)

94. Plaintiffs re-alleges and incorporate the allegations set forth in the paragraphs above.

95. Defendants caused Plaintiffs, and the entire class of non-Filipino Nurses employed by BCHCC during the Class Period to experience adverse employment actions, including lower compensation, constructive discharge and/or being set up for termination or constructive discharge, due to their race (*i.e.*, being a member of a race other than the preferred race of Filipino).

96. Defendants' actions constitute violations of New Jersey Law Against Discrimination (N.J.S.A 10:5-1, *et seq*.).

97. As a result of Defendants' unlawful actions, Plaintiffs in the Currently Employed Class have suffered a loss of wages, benefits, advancements in seniority, and other emoluments of employment and emotional distress; and Plaintiffs in the Formerly Employed Class have suffered a loss of their employment, loss of wages, benefits, advancements in seniority, and other emoluments of employment and emotional distress.

98. Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiffs' rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages.

99. At all relevant times, the individual Defendants and/or other wrongdoers, acted as agents of Bergen County and BCHCC, and Bergen County and BCHCC are vicariously liable for their actions.

### <u>COUNT THREE</u>
**(Title VII – Retaliation)**

100.        Plaintiffs re-allege and incorporates the allegations set forth in the paragraphs above.

101.    Defendants unlawfully retaliated against Plaintiffs in the Retaliation Victim Sub Classes of the Currently Employed Class and the Formerly Employed Class for having engaged in legally-protected activity within the meaning of Title VII.

102.    This represents violations of the anti-retaliation provisions of Title VII.

103.    As a direct and proximate result of the aforesaid occurrence, Plaintiffs sustained injuries.

104.    Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiffs' rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages.

105.    At all relevant times, the individual Defendants and/or other wrongdoers, acted as agents of Bergen County and BCHCC, and Bergen County and BCHCC are vicariously liable for their actions.

**COUNT FOUR**
**(NJLAD – Retaliation)**

106.    Plaintiffs re-alleges and incorporates the allegations set forth in the paragraphs above.

107.    Defendants unlawfully retaliated against Plaintiffs in the Retaliation Victim Sub Classes of the Currently Employed Class and the Formerly Employed Class for having engaged in legally-protected activity within the meaning of the NJLAD.

108.    This represents violations of the anti-retaliation provisions of the NJLAD.

109.    As a direct and proximate result of the aforesaid occurrences, Plaintiffs sustained injuries.

110.    Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiffs' rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages.

111.    At all relevant times, the individual Defendants and/or other wrongdoers, acted as agents of Bergen County and BCHCC, and Bergen County and BCHCC are vicariously liable for their actions.

**COUNT FIVE**
**(NJEPA – Diane B. Allen Equal Pay Act Discrimination in Rate of Pay)**

112.    Plaintiff re-alleges and incorporates the allegations set forth in the paragraphs above.

113.    During the Class Period, Defendants, on the basis of race, denied opportunities to earn overtime rates of pay to non-Filipino nurses in favor of allowing those more valuable hours to be worked by Filipino nurses.

114.    This represents violations of the Diane B. Allen Equal Pay Act (N.J.S.A. 10:5-12 *et. seq.*)

115.    As a direct and proximate result of the aforesaid occurrences, Plaintiffs sustained injuries.

116.    Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiff's rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages and treble damages.

117.    At all relevant times, the individual Defendants and/or other wrongdoers, acted as agents of Bergen County and BCHCC, and Bergen County and BCHCC are vicariously liable for their actions.

**COUNT SIX**
**(Breach of Covenant of Good Faith and Dealing)**

118.      Plaintiff re-alleges and incorporates the allegations set forth in the paragraphs above.

119.  There is, in each contract and in all employment relationships an implied duty of good faith and fair dealing.

120.  The Defendants breached that duty.

121.   Plaintiffs have suffered harm as a result.

122.  Defendants' unlawful conduct was egregious, willful, wanton and/or in reckless disregard of Plaintiffs' rights and, moreover, upon information and belief, involved the participation of upper management, thus warranting the imposition of punitive damages.

123.    At all relevant times, the individual Defendants and/or other wrongdoers, acted as agents of Bergen County and BCHCC, and Bergen County and BCHCC are vicariously liable for their actions.

**COUNT SEVEN**
**(Respondeat Superior)**

124.      Plaintiffs re-alleges and incorporates the allegations set forth in paragraphs above.

125.  Defendants Bergen County and BCHCC are liable for any and all damages incurred as a result of the actions and/or omissions of Defendants Violetta Arcilla and Harvey Silberstein and/or other individuals who engaged in unlawful conduct pursuant to the doctrine of *respondeat superior*.

**COUNT EIGHT**
**(Individual Liability)**

157. Plaintiffs re-alleges and incorporates the allegations set forth in the paragraphs above.

158. Due to, *inter alia*, the control, involvement, and aiding and abetting actions of Defendants Violetta Arcilla and Harvey Silberstein, they are individually liable for the statutory claims asserted herein.

## COUNT NINE
### (Fictitious Party Allegations)

160. Plaintiff re-alleges and incorporates the allegations set forth in the paragraphs above.

161.      Defendants John Does 1-10 and ABC Organizations 1-10 are fictitious individuals, government entities, corporations, partnerships, business entities, or anyone else who participated with the treatment, management, and supervision of Plaintiffs at all relevant times; and/or those with sufficient authority over the County and/or BCHCC and/or who possessed the requisite position such as to be individually liable for violations of law alleged in this Complaint.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all claims and issues so triable.

## PRAYER

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, for the following:

   a.      compensatory damages including back-pay, front-pay, and emotional distress damages;

   b.      punitive damages;

   c.      treble damages pursuant to the NJEPA;

   d.      an Order from this Court, pursuant to Title VII, the NJLAD and the NJEPA, declaring that Defendants have engaged in unlawful

discrimination and enjoining Defendants from further violating applicable federal and state anti-discrimination statutes as they apply to race discrimination;

e.    attorneys' fees and costs of litigation to the undersigned counsel;

f.    pre-judgment and post-judgment interest;

g.    that at the earliest possible time, Plaintiff be allowed to give notice of this Class action, or that the Court issue such notice, to all persons who are presently, or have been at any time since January 1, 2015, up through and including the date of this Court's issuance of Court-supervised Notice, employed by the Defendants as a nurse; and further, that such persons shall be informed of their right to join this lawsuit if they believe they were discriminated against or retaliated against on the basis of their race because they are member of a race other than Filipino;

h.    That this Court designate Plaintiffs as Class representatives, and designate the undersigned as Class Counsel;

i.    An order that Defendants institute and carry out policies, practices and programs that provide equal employment opportunities for all nurses regardless of their race and that Defendants eradicate the effects of their past and present unlawful employment practices;

j.    An order retaining jurisdiction over this action to ensure that Defendant comply with such aforementioned decree; and

k.    such other and further relief as the Court finds just and proper.

- 25 -

MEYERS FRIED-GRODIN LLP
*Attorneys for Plaintiffs*

By_____/s/____Jonathan Meyers_____
Jonathan Meyers

Dated: August 19, 2019

### CERTIFICATION PURSUANT TO LOC. CIV. R. 11.2

The undersigned certifies that, to the best of his knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

MEYERS FRIED-GRODIN LLP
*Attorneys for Plaintiffs*

By_____/s/____Jonathan Meyers_____
Jonathan Meyers

Dated: August 19, 2019